**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TUF-TITE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case no. 14-cv-2060** |
| **v.** | ) | |
| | ) | **Hon. John Z. Lee** |
| **FEDERAL PACKAGE NETWORKS, INC.,** | ) | |
| | ) | **Magistrate Judge Schenkier** |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Tuf-Tite, Inc. ("Tuf-Tite") recently started to manufacture applicators for lip balm. It filed this suit seeking a declaration that its new applicator does not infringe upon a patent owned by Defendant Federal Package Networks, Inc. ("Federal Package"), which currently supplies lip balm applicators for the maker of CARMEX® lip balm. In response, Federal Package filed a counterclaim for patent infringement along with the instant motion for preliminary injunction, asking the Court to enjoin Tuf-Tite from manufacturing or selling its applicator. For the reasons set forth below, the Court grants Federal Package's motion.

### Factual Background

Tuf-Tite is a manufacturing company located in Lake Zurich, Illinois. Compl. ¶ 4. It recently began to manufacture lip balm applicators. Declaration of Steven R. Dakolios ("Dakolios Decl.") ¶ 10.

Federal Package is a manufacturing company located in Chaska, Minnesota, that manufactures, fills, and labels containers for lip balm, cosmetics, and sunscreen. Dakolios Decl. ¶¶ 2, 3. Federal Package is one of the three main businesses in the United States providing such

services to suppliers of lip balm, cosmetics, and sunscreen, *id.* ¶ 3, and currently supplies approximately twenty-five percent of the market for standard lip balm containers. *Id.* ¶ 4.

In 1998, Carma Laboratories, Inc. ("Carma"), the maker of CARMEX® lip balm, saw a need for a lip balm stick applicator which would prevent lip balm from accidentally dispensing, when it is carried in a pocket, for example. *Id.* ¶ 5. Carma asked Federal Package to develop a lip balm stick applicator to solve this problem, and Federal Package turned to one of its consultants, Frank Lang ("Lang"), for assistance. *Id.* ¶¶ 5, 6. Lang subsequently invented an applicator for the incremental dispensing of lip balm (the "Lang Invention"). *Id.* ¶ 6.

On December 3, 1998, Federal Package filed a patent application for the Lang Invention. *Id.* ¶ 6; Declaration of Theodore A. Breiner ("Breiner Decl.") ¶ 2, Ex. 1. Initially, the U.S. Patent and Trademark Office ("USPTO") rejected the claims of the application based on U.S. Patent No. 5,851,079 and German Published Application No. 3118893. Declaration of Michael J. Sherman ("Sherman Decl.") ¶ 10; Breiner Decl. ¶ 7, Ex. 6. Federal Package responded to the rejection by amending the claims to make clear that the claimed incremental or "click-action" dispensing structure of the applicator provides for the lip balm to move both up and down in the container, rather than in just one direction, as described in the other patents. Breiner Decl. ¶ 8, Ex. 7. Based on the amendment, the Patent Office allowed the application and issued U.S. Patent No. 6,129,471 for the Lang Invention, entitled "Stick Applicator With Incremental Dispensing Action" (the "'471 Patent"). *Id.* ¶ 9, Exs. 1, 8.

Since 1998, Federal Package has manufactured exclusively for Carma a stick applicator with incremental dispensing action for the CARMEX® lip balm, which uses the Lang Invention. Dakolios Decl. ¶ 8. Carma uses the registered trademark CLICK STICK® for the lip balm and promotes the incremental or "click-action" dispensing applicator in the sale of the CARMEX®

lip balm. *Id.* The applicator for the CLICK STICK® CARMEX® lip balm has been a commercial success and, Carma believes, has provided it with a marketing advantage over other lip balm manufacturers. *Id.* ¶ 9.

Between 2002 and 2013, Federal Package has manufactured and sold in excess of 180 million containers for the Carma CLICK STICK® CARMEX® lip balm, generating sales revenues in excess of $14 million. *Id.* According to Federal Package, no lip balm manufacturer has marketed a stick applicator with incremental dispensing action. *Id.* ¶ 13. Federal Package and Carma do not have a written contract governing their relationship, but have done business exclusively for fifteen years based on a handshake agreement. 6/30/14 Hearing Tr. at 33-34.

In March 2014, Federal Package learned that Tuf-Tite intended to begin to manufacture and sell a lip balm applicator (the "INPRES applicator"). Dakolios Decl. ¶ 11. According to Federal Package, Tuf-Tite has manufactured a number of the INPRES applicators as samples and offered them for sale to various potential customers, including some of Federal Package's existing customers. *Id.* Federal Package does not believe (and Tuf-Tite's counsel conceded at oral argument) that Tuf-Tite has as yet sold any INPRES applicators, *id,* and this was confirmed by Tuf-Tite's counsel at oral argument.

On March 19, 2014, Federal Package's counsel wrote to Tuf-Tite to notify it of the existence of the '471 patent. Dakolios Decl. ¶ 12; Breiner Decl. ¶ 4; Dkt. 21 at Ex. 3. In response, on March 24, 2014, Tuf-Tite filed the instant action, seeking a declaration of non-infringement. Tuf-Tite notified Federal Package of the filing of the case by letter dated March 26, 2014. Dakolios Decl. ¶ 12; Breiner Decl. ¶ 5; Dkt. 21 at Ex. 4. The March 26 letter stated that the INPRES applicator did not infringe on the '471 patent because it did not include a base wall having an inner wall surface of a non-circular configuration. Dkt. 21 at Ex. 4. On April 4,

2014, Federal Package responded by letter, stating in relevant part, that the INPRES applicator includes a base wall having an inner wall surface of non-circular configuration. Dakolios Decl. ¶ 12; Breiner Decl. ¶ 6; Dkt. 21 at Ex. 5. Federal Package subsequently filed its counterclaim for infringement along with the instant motion. Dkt. 15; Dkt. 18 at 1.

## Legal Standard

The Federal Circuit has explained that "'[t]he grant, denial, or modification of a preliminary injunction . . . is not unique to patent law, so this court applies the law of the regional circuit when reviewing and interpreting such a decision.'" *Trebro Mfg., Inc., v. Firefly Equip., LLC,* 748 F.3d 1159, 1165 (Fed. Cir. 2014) (quoting *Aevoe Corp. v. AE Tech Co.*, 727 F.3d 1375, 1381 (Fed. Cir. 2013)). "However, 'the Federal Circuit has itself built a body of precedent applying the [ ] general [preliminary injunction] considerations to a large number of factually variant patent cases, and [ ] give[s] dominant effect to Federal Circuit precedent insofar as it reflects considerations specific to patent issues." *Id.* (quoting *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 894 (Fed. Cir. 1998)). Therefore, the Court will apply the Seventh Circuit standards governing preliminary injunctions throughout this opinion, except where patent-specific considerations are in play.

Seventh Circuit precedent requires the Court to engage in a two-phase analysis when considering whether to issue a preliminary injunction: a threshold phase and a balancing phase. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the USA, Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008). "To survive the threshold phase, a party seeking a preliminary injunction must satisfy three requirements." *Id.* at 1086. First, the party must show that it will suffer irreparable harm without the injunction. Second, the party must demonstrate that traditional legal remedies would be inadequate. Third, the party must establish that its claim has some likelihood of

succeeding on the merits.  If the party cannot make a showing as to each of these threshold requirements, the preliminary injunction must be denied.  *Id.*; *see also Cox v. City of Chi.*, 868 F.2d 217, 223 (7th Cir. 1989) ("If a plaintiff fails to meet just one of the prerequisites for a preliminary injunction, the injunction must be denied.").  Assuming that, the party meets this initial threshold, the Court proceeds to the balancing phase of the analysis.  *Girl Scouts*, 549 F.3d at 1086.

During the balancing phase, the party seeking the injunction must demonstrate that its harm in the absence of such relief outweighs any harm that may be suffered by the non-moving party if the injunction is granted.  *Id.*  In making this determination, the Court employs a sliding scale approach:  "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor, the less likely he is to win, the more need it weigh in his favor."  *Id.* (quoting *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 389 (7th Cir. 1984)). Additionally, where appropriate, this balancing process "should . . . encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')."  *Id.* (quoting *Ty, Inc. v. Jones Grp., Inc.,* 237 F.3d 891, 895 (7th Cir. 2001)).  Taking into account all of these considerations, the Court must exercise its discretion "to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case."  *Id.* (internal citations and quotations omitted).

The standard for the issuance of preliminary injunctions in the Federal Circuit differs only slightly.  There, "[w]hether a preliminary injunction should issue turns upon four factors: (1) the movant's reasonable likelihood of success on the merits; (2) the irreparable harm the movant will suffer if preliminary relief is not granted; (3) the balance of hardships tipping in its

favor; and (4) the adverse impact on the public interest." *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed. Cir. 1994) (citing *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988)). "The burden is always on the movant to show entitlement to a preliminary injunction." *Id.* (citing *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 388 (Fed. Cir. 1987)). Out of these factors, the most critical factors are likelihood of success on the merits and irreparable harm. "[A] movant cannot be granted a preliminary injunction without findings by the district court that the movant carried its burden on *both* factors." *Id.* at 1556 (emphasis in original).

<u>Analysis</u>

**I.      Likelihood of Success**

In order to prevail on its motion, Federal Package must demonstrate that it has some likelihood of succeeding on the merits of its claim. *See Girl Scouts*, 549 F.3d at 1096. "A reasonable likelihood of success requires a showing of validity and infringement." *Reebok*, 32 F.3d at 1555. In patent cases, "[t]his factor . . . depends fundamentally on the meaning of the asserted claim and its relationship to the accused product or process. Therefore, a correct claim construction is almost always a prerequisite for imposition of a preliminary injunction." *Chamberlain Grp., Inc. v. Lear Corp.*, 516 F.3d 1331, 1339-40 (Fed. Cir. 2008). The validity of the '471 Patent is not in dispute, *see* Dkt. 34 at 2; therefore, the Court need only construe any claims in dispute and then proceed to the question of infringement. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996) (to determine infringement, Court must interpret claims and then apply them to the allegedly infringing product).

## A.        Claim Construction

### 1.        Standard Governing Claim Construction

Claim construction is a question of law to be decided by the Court.  *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).  The Court first looks to intrinsic evidence, which consists of the patent claims, specification, and prosecution history.  *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Words "are generally given their ordinary and customary meaning," *id.*, which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . ." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

Terms are given "the meaning and scope with which they are used in the specification and the prosecution history."  *Kinik Co. v. ITC,* 362 F.3d 1359, 1365 (Fed. Cir. 2004).  The specification is usually "dispositive; it is the single best guide to the meaning of a disputed term."  *Vitronics*, 90 F.3d at 1582.  However, a particular embodiment used in the specification to aid understanding should not import limitations into the claim.  *Superglide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).  Nonetheless, a claim may be limited to its preferred embodiment if permitting expansive claim language would undermine the public notice requirements of 35 U.S.C. § 112.  *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1346 (Fed. Cir. 2005).  As for the prosecution history, it may serve to further "exclude any interpretation that was disclaimed during prosecution."  *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005).  However, a claim may not be narrowed "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history."  *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed. Cir. 2002).

Extrinsic evidence, such as dictionaries and expert testimony, may be used. But such use is limited to those circumstances where the intrinsic evidence alone is insufficient to determine the meaning of the claim terms. *Vitronics*, 90 F.3d at 1583.

Finally, the doctrine of "claim differentiation" provides that "each claim in a patent is presumptively different in scope." *RF Del., Inc. v. Pac. Keystone Techs.*, Inc., 326 F.3d 1255, 1263 (Fed. Cir. 2003). "That presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim." *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007). However, it must be noted that claim differentiation is a "rule of thumb" and not absolute. *Edwards Lifesciences LLC v. Cook, Inc.,* 582 F.3d 1322, 1332 (Fed. Cir. 2009). The scope of a claim may be limited so as to create redundant claims if required by "the clear import of the specification," *id.*, or by the prosecution history. *See Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1116 (Fed. Cir. 2002) (presumption of claim differentiation overcome by disclaimer during prosecution history).

### 2. Construction of Disputed Claim

Federal Package asserts that Tuf-Tite's INPRES applicator infringes claim 1 of the '471 patent. Claim 1 calls for:

> A screw operated applicator for incremental dispensing comprising: a tubular body including an open dispensing end and a base wall having at least one hole through the base wall;
>
> a threaded movable support inside said tubular body, said support being in contact with an inner wall of said tubular body so as to prevent rotation of the support in the body;

a rotatable dispensing screw including a control member disposed adjacent said base wall, a raised portion including at least one protrusion, a snap member and a threaded shaft extending through said hole in the base wall into said tubular body and along a substantial length of said tubular body, said threaded shaft being threadably engaged with said support; wherein said base wall includes *an inner wall surface of a non-circular configuration* which surrounds in use said raised portion of the dispensing screw such that said at least one protrusion interacts with said inner wall surface to provide resistance to turning of said control member and to create at least two favored control member orientations; and wherein said rotatable dispensing screw rotates to cause said support to move up or down in relation to said tubular body based on direction of turning of said control member.

Dkt. 21 Ex. 1 ("'471 Patent") at 5:6 – 6:9 (emphasis added). The dispute between the parties comes down to the following question: does Tuf-Tite's INPRES applicator include "an inner wall surface of a non-circular configuration?"

Federal Package asks the Court to construe this claim to mean any surface that is not a simple, unadulterated circle. *See* Federal Package Reply Br. at 10 (construing phrase as "an inner wall surface which is not a circle"). On the other hand, Tuf-Tite proposes that "non-circular configuration" means "an arrangement of parts in a shape that manifests discrete sides and excludes any arrangement that outlines a circle, including a circular wall with projections." *See* Tuf-Tite Resp. Br. 9. It is worth noting that the first proposed construction ("A") is inclusive of the second ("B"), while B is narrower than A.



In deciding which construction is proper, the Court first turns to the intrinsic evidence, beginning with the language of the patent claim itself. *See Vitronics*, 90 F.3d at 1582. As a

threshold matter, the phrase "an inner wall surface of a non-circular configuration," as it appears

in the claim, is not particularly helpful, because it does not state with any clarity whether "non-

circular configuration" means (A) any shape that is not a circle, or (B) any shape that has discrete

sides and does not have elements (such as projections) arranged in a circular fashion.  But claim

1 further teaches that "at least one protrusion [from the dispensing screw] interacts with said

inner wall surface to provide resistance to turning of said control member and to create at least

two favored control member orientations."  '471 Patent at 6:3 – 6.  In other words, the inner

surface must have some element that provides resistance to a protrusion emanating from the

dispensing screw.  This reading is further supported by the specification.[1]  Thus, when construed

in conjunction with the other elements of the claim, *see Phillips*, 415 F.3d at 1313, "non-circular

configuration" means, at the very least, that the inner surface cannot be a shape that is a simple

---

[1]     The specification contains numerous references to the interaction between the inner wall surface
and the dispensing screw:

> Protrusions on the dispensing screw interact with the base wall of the body to
> provide resistance to the smooth rotation of the control member and cause
> the control member to favor certain predetermined positions.  The base wall
> includes an inner wall surface at its lower end which interacts with the
> protrusions to provide click action and, thus, controlled incremental
> dispensing.

'471 Patent, Abstract.

> Turning of the control member of the dispensing screw turns the threaded
> shaft which in turn causes the support to move up or down inside the tubular
> body with concomitant extension or retraction of product from the open
> dispensing end of the body.

*Id.,* 2:38 – 42.

> [T]he dispensing screw has at least one protrusion on or near the control
> member that interacts with a specially configured wall structure present in
> the tubular body to interfere with or resist continuous or uncontrolled turning
> of the control member.  The effect is that the control member stops at certain
> predetermined orientations upon turning and further turning by a user is
> required for continued turning and thus dispensing.

*Id.,* 2: 46 – 54.

circle.  The question remains, however, whether the intrinsic evidence also requires that the construction of the term be limited further to "an arrangement of parts in a shape that manifests discrete sides and excludes any arrangement that outlines a circle, including a circular wall with projections," as Tuf-Tite contends.  The Court concludes that it does not.

First, Tuf-Tite argues that the Court need only rely on the "plain and ordinary meaning" of the phrase to adopt its construction.  But such a construction is not helpful when one considers the claim language and the specification.  Take, for example, figure 4 of the patent, which depicts a preferred embodiment with an inner wall that consists of eight sides of equal length.



Not only can the arrangement of the eight sides be described as having an "outline" (depicted in figure 4 as a red circle) that is "shaped like a circle," but as one increases the number of sides of the inner wall (say to 16 or 32 sides of equal length), the "outline" of the inner wall becomes more and more "shaped like a circle."  Under Tuf-Tite's "plain meaning" construction, such a device would be excluded from the scope of the patent, even though it is disclosed in the specification.[2]

---

[2]  During oral argument, Tuf-Tite's counsel pointed to a circular saw as an example of an item with a circular configuration.  5/7/14 Hearing Tr. at 8:21-24, 11:11-25.  According to Tuf-Tite, a device that has an inner wall with a number of projections extending inward towards the center where the tips of the projections form a circular shape would not fall within the scope of the term "non-circular configuration."

Next, Tuf-Tite points to the specification and the embodiments depicted in figures 4, 5 and 6, arguing that, '[i]n each of the multiple embodiments described, the corners of the multi-sided shape interact with a protrusion located on the dispensing screw to create a clicking action when a user turns the control knob." Tuf-Tite Resp. Br. 6. From this, Tuf-Tite asserts that the patent discloses only inner walls with multiples sides and a corner. *Id.* 5 – 6.

Tuf-Tite's description of the preferred embodiments may be correct, but it is hornbook law that the limitations from the specification should not be read into the claim itself. *See Superglide*, 358 F.3d at 875; *see also Phillips*, 415 F.3d at 1323 (courts should "avoid the danger of reading limitations from the specifications into the claim"). This is particularly true here, where the specification expressly states that "[v]arious embodiments of the present invention are available. Numerous inner wall surface configurations are possible according to the principle of click-action interaction between a base wall and a screw member as described above." '471 Patent at 4:48 – 52.[3]

Furthermore, adopting the construction proposed by Tuf-Tite would offend the doctrine of claim differentiation. Claim 4, which is a dependent claim, teaches an "applicator according to claim 1 wherein said inner wall surface of the base wall has a multi-sided configuration with each side being of substantially equal length." '471 Patent at 6:14 – 17. As Federal Package correctly notes, this description covers the preferred embodiments illustrated in figures 4, 5, and 6 of the patent – each figure depicts an inner wall surface that has discrete sides. Thus, under the doctrine of claim differentiation, claim 1 must necessarily be broader in scope than claim 4, and

---

Dkt. 30 at 5. But, by focusing on the tips of the projections, Tuf-Tite's construction does not do justice to the actual wording of the claim, which discloses "an inner wall *surface*" that has a "non-circular configuration."

[3] Additionally, the patent provides that "various modifications can be made within the scope of the aforesaid description. Such modifications being within the ability of one skilled in the art form a part of the present invention and are embraced by the appended claims." *Id.* at 5:1 – 5.

the term "non-circular configuration" in claim 1 must encompass more than "an arrangement of parts in a shape that manifests discrete sides," as Tuf-Tite contends. *Trebro Mfg.*, 748 F.3d at 1167.

Finally, Tuf-Tite argues that Federal Package's January 11, 2000, amendment to its claims constituted a prosecution disclaimer that defeats Federal Package's proposed construction. Specifically, Tuf-Tite asserts that when Federal Package amended its patent application after the initial rejection, it "expressly disclaimed the structure" of the two patents cited by the examiner as "both generally circular in cross-section with projections that impede movement, from coverage by the language of claim 1." Tuf-Tite Resp. Br. 10. Therefore, Tuf-Tite asserts, Federal Package has expressly disclaimed any definition of non-circular configuration "that encompasses circular cross-sections with any element that impedes movement. . . ." *Id.*

In order for the Court to conclude that Federal Package's current construction was disclaimed during prosecution, the disclaimer must have been reasonably clear and deliberate. *See N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1294 (Fed. Cir. 2000). The record does not demonstrate that a reasonably clear disclaimer occurred. The claim language at issue, "an inner wall surface of a non-circular configuration," was part of the original claim filed by the patentee, and this portion of the claim was never amended by Federal Package. Furthermore, in its submission to the USPTO, Federal Package did not narrow the meaning of the term "inner wall surface of a non-circular configuration" from that originally claimed, other than to inform the patent examiner that the dispensing screw and inner wall surface allowed for bidirectional, as opposed to unidirectional, movement. Breiner Decl. ¶ 8, Ex. 7. Thus, Tuf-Tite's reliance upon the prosecution history is unavailing.

For all of the foregoing reasons, the Court adopts Federal Package's proposed construction and construes the phrase "inner wall surface of a non-circular configuration" to mean "an inner wall surface which is not a circle."[4]

**B.      Infringement**

Once the Court has construed the claims at issue, it must apply them to the allegedly infringing product to determine whether it is, in fact, infringing. *Markman*, 52 F.3d at 976. A party establishes infringement in one of two ways: literal infringement of the claim language or infringement under the doctrine of equivalents. *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 35 (1997). Literal infringement occurs where the allegedly infringing device includes all elements of the claim. *Trebro Mfg.*, 748 F.3d at 1166. Infringement under the doctrine of equivalents occurs where the allegedly infringing device "performs substantially the same function in substantially the same way to obtain the same result" as the patented product. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950). Neither manner of infringement requires proof of intent to infringe. *Warner-Jenkinson*, 520 U.S. at 35.

Here, the Court finds that Federal Package has a reasonable likelihood of succeeding on the merits of its infringement claim. Tuf-Tite's INPRES applicator's base and inner wall surface appear as follows:

---

[4]      Tuf-Tite also argues, albeit very perfunctorily, that if the Court were to adopt Federal Package's construction, the patent would violate the written description requirement of 35 U.S.C. §112. Tuf-Tite Resp. Br. at 14-15. But, this contention is based entirely upon Tuf-Tite's own claim construction and interpretation of the specification (for example, it again argues that "there is no disclosure of any invention that uses an inner wall with a circular outline" and cites to the same prosecution history). For the reasons discussed above, this argument also fails.



Federal Package argues that the INPRES applicator features a base wall with an inner wall surface that is of a non-circular configuration due to the outward projections in the inner wall surface, which interact with the dispensing screw to provide resistance to the turning of the screw in dispensing the product. Sherman Decl. ¶¶ 6-8. As Federal Package points out, if the inner wall surface were circular, with no outward projections, "the two protrusions on the INPRES applicator would have nothing to interact with." Dkt. 20 at 8. As noted above, the Court construes the term, "an inner wall surface of a non-circular configuration," to mean "an inner wall surface which is not a circle." Here, the Court finds that the INPRES applicator is comprised of an inner wall surface that is not a circle and thus literally infringes upon the '471 patent. Accordingly, Federal Package is likely to succeed on the merits of its direct infringement counterclaim.[5]

---

[5]     Because the Court finds that Federal Package has demonstrated a likelihood of success with respect to its infringement claim based upon a theory of literal infringement, it need not address Federal Package's alternative theory based upon the doctrine of equivalents. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1375 (Fed. Cir. 2013) (where court determined defendant literally infringed, did not need to address arguments regarding doctrine of equivalents).

## II.     Irreparable Harm

The second threshold requirement that an injured party must satisfy in order to obtain preliminary injunctive relief is to demonstrate that it will suffer irreparable harm in the absence of the relief it seeks.  *See Girl Scouts*, 549 F.3d at 1086; *see also Reebok*, 32 F.3d at 1556.  While the Federal Circuit held in the past that "a movant who clearly establishes the first factor receives the benefit of a presumption on the second," *Reebok*, 32 F.3d at 1556, that is no longer the law. *See Apple Inc. v. Samsung Electronics Co., Ltd.*, 735 F.3d 1352, 1359 (Fed. Cir. 2013) (citing *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1148 (Fed. Cir. 2011) (no presumption of irreparable harm upon finding of patent infringement).  Thus, Federal Package must satisfy an independent burden of establishing irreparable harm.

Furthermore, it is important to bear in mind that "[t]he patent statute provides injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money." *Reebok*, 32 F.3d at 1557 (citing *Hybritech,* 849 F.2d at 1457).  Moreover, "[b]ecause the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole." *Id.* (citing *Hybritech*, 849 F.2d at 1456-57).  Along these lines, the Federal Circuit has noted that "[h]arm to reputation resulting from confusion between an inferior accused product and a patentee's superior product is a type of harm that is often not fully compensable by money because the damages caused are speculative and difficult to measure." *Id.* at 1558.  *See also Trebro*, 748 F.3d at 1170 ("likely loss of market share and loss of access to customers . . . are pertinent to the irreparable harm inquiry"); *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1233 (Fed. Cir. 1985) ("While monetary relief is often the sole remedy for past infringement, it does not follow that a money award is also the sole remedy

against future infringement. The patent statute further provides injunctive relief to preserve the legal interests of the parties *against future infringement* which may have market effects never fully compensable in money.").

According to Federal Package, it will be irreparably harmed in the absence of an injunction because it will suffer from price erosion, loss of market share, lost sales, and loss of goodwill from its customer base. 6/30/14 Hearing Tr. at 29-32. The Dakolios Declaration further supports these contentions. Dakolios Decl. ¶¶ 13-16. The Court finds that the evidence Federal Package has put forth in this regard is sufficient to meet its burden as to irreparable harm. *See Trebro*, 748 F.3d at 1170 (testimony regarding potential harm to reputation in the marketplace and loss of market share sufficient to establish irreparable harm).

## III. Balancing of Hardships

In the third prong of the preliminary injunction analysis, "the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Girl Scouts*, 549 F.3d at 1086; *see also Hybritech*, 849 F.2d at 1457 (citing *H.H. Robertson*, 820 F.2d at 390) ("[t]he district court must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted."). "The more likely it is that [the movant] will win its case on the merits, the less the balance of harms need weigh in its favor." *Girl Scouts*, 549 F.3d at 1100. The Seventh Circuit considers the question of the potential impact of the injunction on the public interest in conjunction with the balancing analysis, *see id.* at 1100, while the Federal Circuit considers the effect on the public interest as a separate prong of its preliminary injunction analysis. *See Hybritech*, 849 F.2d at 1458 ("Typically, in a patent

infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief."). *Hybritech*, 849 F.2d at 1458.

The potential harm to Federal Package has already been discussed. For its part, Tuf-Tite did not address this prong of the analysis in its response brief. However, Tuf-Tite did submit a declaration from Theodore Meyers ("Meyers Declaration"), who averred that an preliminary injunction would cause harm to Tuf-Tite by delaying sales of the INPRES applicator, requiring retooling costs, and damaging Tuf-Tite's industry reputation and customer relationships. Meyers Decl. ¶¶ 9-11.

After weighing the respective harms, the Court finds that the potential harm to Federal Package in the absence of preliminary injunctive relief outweighs any potential harm that such relief would impose upon Tuf-Tite. This is particularly true here, in light of Federal Package's substantial likelihood of succeeding on the merits of its infringement claim, its prominent position in the lip balm applicator market, and its long-established relationship with Carma. In contrast, Tuf-Tite has only recently entered the market for manufacturing applicator sticks with its INPRES product. Furthermore, at the most recent hearing on November 6, 2014, Tuf-Tite's counsel informed the Court that Tuf-Tite has not found much customer interest in the patented feature and has been selling other products without the feature.

As for the public interest, Federal Package argues that there is none at stake other than the usual interest in protecting patents. Tuf-Tite puts forth no argument to the contrary. Accordingly, the Court finds that issuance of a preliminary injunction will further the public interest in securing patent rights, and this factor favors issuance of injunctive relief.

For these reasons, the balancing of harms favors an award of preliminary injunctive relief to Federal Package.

## IV.    Bond

Finally, because the Court is granting Federal Package's motion, it must consider whether to impose an injunction bond upon Federal Package pursuant to Fed. R. Civ. P. ("Rule") 65(c). Rule 65(c) provides that the Court may only issue preliminary injunctive relief "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  In this Circuit, intellectual property injunction "bonds must reflect full costs" in order to "hold in check the incentive business rivals have to pursue relief that gives them a competitive edge even if . . . they lose in the end."  *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000).

Tuf-Tite contends that, if Federal Package's motion were granted, it would incur approximately $110,000.00 in rehabilitative advertisement costs, $40,000.00 in retooling costs, and an additional $1,000,000 in lost sales to Carma (half of which could be offset by selling other applicators).  Meyers Decl. ¶¶ 9-12.   Thus, Tuf-Tite urges the Court to impose a bond in the amount of $540,000.00.

In response, Federal Package asks the Court to impose only a "minimal" bond, arguing that Tuf-Tite's request is based upon the mere possibility that Tuf-Tite could sell the INPRES applicator to Carma, while Federal Package has produced a second declaration from Steven R. Dakolios ("2d Dakolios Decl."), the President of Federal Package Network Inc., averring that Carma does not intend to purchase any lip balm applicators from Tuf-Tite.  2d Dakolios Decl. ¶ 3.  Federal Package further points out that Tuf-Tite has not identified any other potential

customers for the INPRES applicator at this time.  Def.'s Reply at 15.  It does not contest the other assertions made by Meyers.

The Seventh Circuit's guidance in *Mead Johnson* was that in "setting the amount of security, district courts should err on the high side."  201 F.3d at 888.  Here, the Court finds that a bond in the amount of $250,000.00 is sufficient to protect Tuf-Tite's interests.  In arriving at this figure, the Court credits Meyers' uncontroverted statements that Tuf-Tite would incur costs of approximately $150,000.00 for retooling and rehabilitative advertising.  As for lost profits, in light of the well-established relationship between Federal Package and Carma (and, indeed, Carma's part in the development of the invention), the Court finds Tuf-Tite's conclusory assertion that it will be able to usurp Federal Package as Carma's supplier neither credible nor persuasive.  Furthermore, as noted above, to date, Tuf-Tite has not found any significant market interest in the INPRES applicator.  Accordingly, the Court finds that a significant discount of Tuf-Tite's anticipated sales estimate in the order of 75% is appropriate, while still keeping the resulting figure "on the high side."  The Court therefore orders that Federal Package post a bond in the amount of $250,000.00 within fourteen days of this order.

## Conclusion

For the foregoing reasons, the Court grants Defendant Federal Package Networks, Inc.'s Motion for Preliminary Injunction [dkt. 18]. Defendant is directed to meet and confer with Plaintiff Tuf-Tite, Inc. and to provide the Court with a proposed order within three [3] days of this Order consistent with the Court's holding herein. Pursuant to Fed. R. Civ. P. 65(c), Federal Package is further directed to post a bond in the amount of $250,000.00, within fourteen days of this Order.

SO ORDERED                                ENTERED: 11/21/14

_____
John Z. Lee
United States District Judge